UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


ALICIA ELSWICK,

      Plaintiff/Counter-Defendant,

v.                               Civil Action No. 2:06-0482

LIFE INSURANCE COMPANY OF NORTH
AMERICA and doing business as
CIGNA GROUP INSURANCE, and CAMCARE
INCOME PROTECTION PLAN,

      Defendants/Counter-Claimant.


MEMORANDUM OPINION AND ORDER


      Pending is the motion to develop evidence in supplement of the administrative record, filed by the plaintiff Alicia Elswick ("Elswick") on October 31, 2006.


I.


A.      Background


      Beginning on February 18, 1991, plaintiff was employed by Camcare, Inc. as a nurse.  (A.R. at 696-697, 684).  Eligible employees of Camcare were covered by the Camcare Income Protection Plan ("Plan"), which is underwritten by the Life

Insurance Company of North America d/b/a CIGNA Group Insurance
("LINA"). (<u>Id.</u> at 759-779).

> The plan provides as follows:

An employee is Disabled if, because of injury or
Sickness,

1.   He or she is unable to perform all the material
     duties of his or her regular occupation; and

2.   After Monthly Benefits have been payable for 24
     months, he or she is unable to perform all the
     material duties of any occupation for which he or
     she may reasonably become qualified based on
     education, training, and experience.

(<u>Id.</u> at 766).

On August 8, 1997, Elswick submitted a claim for
disability benefits based on her symptoms associated with
interstitial cystitis. (<u>Id.</u> at 698-699, 751). Interstitial
cystitis is an incurable urinary bladder disease of unknown cause
typically affecting middle-aged women and is characterized by
urinary frequency, urgency, and pain in the bladder and pelvis.
(<u>Id.</u> at 6-7, 28-29, 683).

By letter dated September 30, 1997, LINA approved
plaintiff's claim. (<u>Id.</u> at 654-655).

2

B.        Dr. Firfer's "Peer Review"[1]


        Internal LINA forms, as early as October 18, 2004,
noted that Elswick had left for Switzerland on or about September
9 or 10, 2004 and was to return sometime between October 25 and
28, 2004.  (Id. at 12, 142).  Notes from a meeting of LINA
personnel, including Dr. Charles M. McCool, on April 28, 2005,
indicate that their review of the file found "the clinical
evidence did not support . . . [Dr. Sullesta's conclusion that
Elswick is disabled].  As a result, it was felt that a PEER
Review was needed to comment on the clinical evidence on file and
functional abilities with respect to the diagnosis."  (Id. at
67).

        On May 3, 2005, LINA sent plaintiff's file to Dr.
Raymond Firfer along with a letter with a list of questions to
resolve.  (Id. at 104-105).  The letter provided the phone number
of plaintiff's treating physician, Dr. Renee Sullesta, and asked
Dr. Firfer to contact him.  (Id. at 105).  Dr. Firfer, who has
never personally met with the plaintiff, called and spoke with

---

        [1]  A peer review, as LINA uses the term, refers to a non-
treating doctor's review of a patient's file to determine whether
the treating physician's diagnosis and description of disability
and prospects for work are accuracte.

3

Dr. Sullesta on May 16, 2005.  (Id. at 32).

The following are Dr. Firfer's conclusions as set forth in the "determination/answers to the questions" section of the peer review completed on May 17, 2005:

1.   There is a minimal objective suggestion of interstitial cystitis since the last bladder volume was 600 cc although it was done under anaesthesia and that was accomplished January 15, 2002.  There is no volume noted after that, however on October 28, 2002 a note indicated she voids every 1-2 hours during the day and has to get up to void 2-3 times at night and this could justify a diagnosis of interstitial cystitis. This is primarily referring to a symptom complex. No documentation as to her voiding frequency or bladder volume without anesthesia anywhere in the notes.

2.   As far as question number 2 is concerned wherein you ask were there any things that could be accomplished to facilitate the patient's return to work I would have to say that she would have to be near toilet facilities in order to solve her problem of urgency and frequency.

3.   I might point out there are no guidelines for a return to work with interstitial cystitis that I know of at the present time.  Her urinary urgency, frequency and nocturia will limit the ability to work if the bladder capacity becomes so small as to make voiding a handicap in the workplace.  Pain is a different aspect of interstitial cystitis and requires analgesic use, which can affect the mental acuity of the patient.  Interstitial cystitis has periods of remission and exacerbation, which are arbitrary and related somewhat to normal living habits and emotional activity.  She has had intervals of possible remission as evidenced by prolonged intervals between office visits and hospital care which may

4

have been periods of diminished symptom severity, but this has not been documented in the records.

4.  In question 4, I might point out that each patient with interstitial cystitis is unique in the different response to various treatment programs toward the varied severity of the symptoms.  I believe she has been treated appropriately for her interstitial cystitis although the analgesic indulgence because of the pain symptom has interfered with periods of remission.  The severity of subjective pelvic pain may not reflect the objective changes of Interstitial Cystitis.

5.  I have already made mention of her work capabilities posed in question number 3 and I do not believe her physical ability would restrict her in performing full time medium duty work, according to the occupational description of the Department of Labor from the perspective of her bladder function, however, I should point out that the records sent to me are replete with frequent and heavy use of assorted analgesics for her subjective bladder pain.  I defer comment to an appropriate specialist on any cognitive issues associated with the effects of the narcotic analgesics in her job description.

6.  In question number 6, I will respond by saying that the first and most important concern in this patient is a lack of motivation since it is easier to take analgesics and hope it will go away.  As mentioned previously there is no set pattern of remission and exacerbation.  Periodic urinary tract infections, dietary indiscretions, and even sexual encounters may flare up symptoms for varying periods and may require mild or intensive treatment with time off from work.

I spoke to Dr. Sullesta as I mentioned previously and verified the main problem is the subjective symptom of pain, which has not been possible to resolve, permanently or completely.  The patient has refused Botox and InterStim therapies which have been reported to help in some resistant circumstances.  I

5

specifically asked as to the bladder volume and
frequency of voiding, but Dr. Sullesta would only
comment regarding her inability to work because of pain
from the Interstitial Cystitis.  The subjective pain
and analgesic therapy are considered the main cause of
her inability to work, however, without recent
documentation to the contrary, the physical changes of
her Interstitial Cystitis does not seem to completely
eliminate her ability for full time medium employment.
I hope this clarifies the impression of this review as
to her capabilities of employment.

(Id. at 32-33).


C.       Dr. Sullesta's Pre-Decision Opinions


        After her application for disability was filed in 1997,

LINA repeatedly asked Dr. Sullesta to produce records or complete

a various assortment of their forms.  (Id. at 113, 116, 125, 140-

141, 143, 153, 159-160, 252-253, 276-282, 288, 375-376, 397-398,

483, 496-500, 516, 531-535, 687, 702-706).

        On September 19, 1997, Dr. Sullesta completed LINA's

"physical capacities evaluation" form and was presented at the

end with the following options regarding plaintiff's ability to

perform on a full time basis:

    Very Heavy Work: Lifting Objects over 100 pounds and
    frequently lifting/carrying of 50 pounds or more.
    Frequent Standing/walking.

    Heavy Work: 100 pounds of maximum lifting with
    frequently lifting/carrying of up to 50 pounds,

6

frequent standing/walking.

**Medium Work**: 50 pounds of maximum lifting with frequently lifting/carrying of up to 25 pounds, frequent standing/walking

**Light Work**: 20 pounds maximum lifting.  Carrying 10 pound articles frequently, most jobs involving sitting with a degree of pushing or pulling.

**Sedentary Work**: 10 pounds maximum lifting and/or carrying articles.  Walking/standing on occasion.

(Id. at 665).  In the boxes to the right of these options, Dr. Sullesta checked "no" for the first four options but checked "yes" for the sedentary work option.[2]  (Id.).  Under the terms of the plan, this statement did not affect her claim for disability at the time as it was within the first 24 months and it was clear that she could not perform her regular duties as a nurse.  (Id. at 766).

Dr. Firfer's review of plaintiff's medical records states, "[i]n March of 1999 Dr. Renee Sullesta indicates in his notes that she would be able to do full time sedentary duty."

---

[2]  On May 29, 1998, Dr. Sullesta completed a portion of another LINA form entitled supplementary claim for disability benefits.  (A.R. at 577-578).  Box 5 of the form provided five classes of physical impairment options and then underneath those was a box entitled "Remarks."  (Id. at 778).  Dr. Sullesta checked the "Remarks" option rather than any of the five physical impairment options.  (Id.).  However, there are no additional remarks made on the form.  (Id.).  The form did not otherwise contain any useful comments from Dr. Sullesta.  (Id.).

7

(Id. at 32).  The only form in the administrative record
completed by Dr. Sullesta during March of 1999 was a "physical
ability assessment" on March 26, 1999, and it does not conclude
that Elswick would be able to perform full-time sedentary work.
(Id. at 484-485).

From at least June 14, 1999 through May 16, 2005, Dr.
Sullesta was consistent in his determination that plaintiff was
disabled and unable to perform any type of work due to severe
pain and the effects of medication taken to reduce the pain.  In
a letter to LINA dated June 14, 1999, Dr. Sullesta stated the
following:

> This is in regard to the disability claim on the above
> captioned patient.  Ms. Elswick states that she has
> received notice that her disability benefits will be
> terminated.
>
> Ms. Elswick is currently being treated for interstitial
> cystitis, which is very disabling due to the severe
> pain.  The pain is being managed by Dr. J.K. Lilly and
> she is currently taking Oxycontin, 180 mgs., tid;
> Roxicodone, 5 mgs., tid and Methadone, 5-10 mgs., tid
> to help control the pain.
>
> She is able to maintain most functions of her personal
> daily living while on these medications but the side
> effects of these narcotics, such as sedation, decreased
> motor function, impaired concentration and an inability
> to operate a motor vehicle or machinery would
> jeopardize her holding any job position.
>
> It is my opinion that Ms. Elswick continues to be
> disabled due to active and painful interstitial
> cystitis and will remain disabled until such time as

> there is significant improvement in her physical
> condition or changes in the medications that are used
> to attempt to manage the pain related to her disease.

(Id. at 426).

On January 19, 2000, in another physical capacities evaluation completed for LINA, Dr. Sullesta answered the following question negatively: Is it physically possible for patient to work an eight-hour day?  (Id. at 226).  Dr. Sullesta's evaluation from that day further noted Elswick's severe pain and that there was no evidence of malingering.  (Id.).

On October 22, 2002, Dr. Sullesta largely failed to complete a form faxed to him by LINA, which included a request that he indicate the level of work functionality of the plaintiff.  (Id. at 221-222).  Dr. Sullesta did note on the form, however, that plaintiff's episodes of frequency and duration were constant and her prognosis was "fair -> poor."  (Id.).

On November 8, 2002, in a "physical ability assessment" form provided by LINA, Dr. Sullesta wrote over the options on the form: "See copy of last evaluation."  (Id. at 223-224).  In the space for remarks he indicated, "patient is not better at all, even worse than before."  (Id. at 224).

An internal LINA document dated March 2, 2004, notes,

9

"In early to mid 2003, Dr. Sullesta stated that cx [patient Elswick] was 'totally disabled.'  (It was not clear whether or not he was disabling her just from the nursing)."  (<u>Id.</u> at 169). Dr. Sullesta's statement of disability of March 11, 2003 does indeed characterize the plaintiff as "totally disabled" and remarked "patient is now on narcotic patches and methadone to pain control."  (<u>Id.</u> at 216).

On March 22, 2004, Dr. Sullesta completed another of LINA's physical ability assessment forms, which concluded with "this pt [patient] has been unable to work since 2/25/1997.  She is on narcotics patches & methadone for pain control.  This pt. will be unable to return to work."  (<u>Id.</u> at 177).

Dr. Sullesta's latest physical ability assessment form in the administrative record was completed on September 29, 2004. At the conclusion of the form, he wrote, "patient has had no change since last assessment 3-22-04.  Will not be able to return to work because she is on narcotic patches and methadone for pain."  (<u>Id.</u> at 144-145).

Though LINA requested from Dr. Sullesta that he provide a "statement of disability" on November 23, 2004, and January 10, 2005, there are no such statements in the administrative record.

10

(<u>Id.</u> at 140-141).

Dr. Firfer's peer review stated that in their phone conversation of May 16, 2005, Dr. Sullesta expressed his opinion that Elswick could not work at all due to severe pain.  (<u>Id.</u> at 32).  The peer review further noted that Dr. Sullesta "did feel that she may require further care in the form of Botox installations and injections in the bladder as well as neurostimulation as another alternative."  (<u>Id.</u> at 32).

On June 20, 2005, a copy of the peer review was sent to Dr. Sullesta.  (<u>Id.</u> at 21).  Between June 20 and 27, 2005, LINA faxed -- on three different occasions -- a form to Dr. Sullesta asking him to select one of the following five choices:

> I agree with Dr. Firfer that she is capable of performing full-time Sedentary work.

> I agree with Dr. Firfer that she is capable of performing full-time Light work.

> I agree with Dr. Firfer that she is capable of performing full-time Medium work.

> I disagree with Dr. Firfer's assessment.  If so, we ask that you provide a detailed explanation as to what continues to prevent her from returning to gainful employment.

> I have no comment on the PEER Review.

(<u>Id.</u> at 30).  Dr. Sullesta circled and placed a checkmark next to the third option indicating that Elswick could perform medium

11

work on a full-time basis and returned the form by facsimile to
LINA on June 29, 2005.  (Id.).  Inexplicably, Dr. Sullesta's
response was a complete reversal from his phone conversation with
Dr. Firfer only six weeks earlier when Dr. Sullesta indicated his
belief that Elswick was totally disabled due to severe pain.
(Id. at 32).


D.        Decision to Terminate Benefits


          On July 11, 2005, plaintiff's benefits were terminated
based on LINA's determination that she no longer met the
definition of disability under the plan.  (Id. at 57, 60).  On
July 20, 2005, LINA explained its decision as follows in the
summary portion of its letter to Elswick.  (Id. at 64).

     The Peer Review was shared with Dr. Sullesta for his
     review and comments.  On June 29, 2005, the doctor
     advised he agreed with Dr. Firfer's assessment of your
     ability to perform full-time medium work.

     We acknowledge that you may experience pain attributed
     to Interstitial Cystitis.  Rather, what we are saying
     is, despite your reported signs/symptoms, there is no
     current documentation of bladder volumes and/or urinary
     frequencies to substantiate the presence of a severe
     condition thereby preventing your return to gainful
     employment.  Furthermore, both Drs. Firfer and Sullesta
     feel you are capable of performing up to medium work
     and a Transferable Skills Analysis identified
     occupations that would allow for breaks during the day.

     With respect to possible cognitive issues related to

                              12

> medication side effects raised by Dr. Firfer in his
> Peer Review, this was discussed with our Associate
> Medical Director.  As Dr. Firfer pointed out, pain is
> one aspect of interstitial cystitis that may require
> the need for analgesics which can affect mental acuity.
> However, our Associate Medical Director did not feel
> further clarification was needed since it had already
> been determined that the clinical evidence on file did
> not support a functional impairment that would preclude
> return to work.
>
> Therefore, based on the information currently on file,
> we have determined that you no longer meet the
> definition of total disability from any and all
> occupations and your claim has been closed.

(Id. at 64).  LINA's notes indicate the Associate Medical

Director found it important that Drs. Firfer and Sullesta

believed that plaintiff could return to work and that the

clinical evidence on file so indicated as well, resulting in the

conclusion that further clarification of the impairment caused by

plaintiff's medication was unnecessary.  (Id. at 67).

In the "Information and/or Medical Reviewed" section of

the letter explaining the decision, LINA references plaintiff's

disability questionnaire of February 9, 2005, in which plaintiff

states she is "probably going to start the bladder installations

that require hospitalizations again . . . ."  (Id. at 62).  In

the "Peer Review" section of the letter, LINA points to Dr.

Firfer's quotation of Dr. Sullesta on May 16, 2005, that

plaintiff has refused Botox installations and injections in the

13

bladder or possible neurostimulation.  (Id.).


E.        Administrative Appeal


        Plaintiff appealed LINA's decision internally and
provided additional letters from herself, her stepfather, her
mother, and Dr. Sullesta.  (Resp. at 3).  The letter from Dr.
Sullesta dated December 9, 2005, provided:

> I have been Miss Elswick's treating physician for about
> 15 years now.  When she was a nurse at CAMC, she
> started to develop interstitial cystitis; painful
> bladder syndrome, up to the present.
>
> In September 2005, Miss Elswick developed severe
> bladder pain and had to be hospitalized.  Her
> hospitalization was even a little delayed because she
> is always having pain but actually during that time her
> pain was due to kidney stones, on top of the constantly
> painful bladder.
>
> It is true that Miss Elswick was able to travel out of
> the country, but I provided her with enough medication
> to take care of her while she is out of the country.
>
> Currently she is on Flomax 0.4 mg. daily, Enablex 15
> mg. BID, Methadone 20 mg. TID, Ativan 2 mg. at bedtime,
> Phenergan 25 mg. Q 4 H PRN for nausea and vomiting and
> Fontanyl 100 mg.  Every 3 days.
>
> Even with the amount of medication she is still in pain
> and she still has severe urgency and frequency.  The
> medicine just makes the pain, frequency, and urgency
> tolerable.
>
> Also, because of the medication it is not safe for her
> to drive a motor vehicle.  At the present time there is
> no known cure for this disabling disease.

Until we find a cure for this Miss Elswick will be continuously disabled.

(A.R. at 28-29).

On January 11, 2006, LINA wrote a letter to Dr. Sullesta, which, in part, asked him to explain his inconsistent statements. (Id. at 22). He did not respond until March 14, 2006.

In the meantime, Dr. McCool, the leader of the appeal panel for plaintiff's claim, concluded a review of the file on February 16, 2006. (Id. at 9, 12-17). The analysis section of his file review states as follows:

The claimant has a long history of interstitial cystitis which was apparently initially diagnosed in the mid-1980s. She has been on multiple pain medication and remains on pain medications which are fairly strong. She is, according to her disability questionnaire, able to do activities of daily living and do things such as use the computer on occasions as well. She is able to drive.[3] Having reviewed all the pertinent clinical information in this file, the results of the full file review by me again do not support the restrictions and limitations for the claimant.

(Id. at 16). On February 22, 2006, LINA denied Elswick's appeal. (Id. at 8-10).

---

[3] Contrary to Dr. McCool's assertions, Elswick's disability questionnaire of February 9, 2005, indicates that she does not use the computer and follows Dr. Sullesta's advice not to drive because of the medication he prescribed. (A.R. at 135).

15

On March 14, 2006, Dr. Sullesta finally responded to LINA's request of January 11, 2006, with this statement.

> It is true that I may have incidentally, in my conversation with Dr. Firfer, stated that Ms. Elswick could return to sedentary duty.  I was totally wrong.
>
> I know that behind the base fact that she presents in the office at time she is always in pain.  Her pain is constant, does not disappear at all but only varies intermittently with the help of the pain medications she is taking.  She can hardly do anything.  Even changing clothes has become a chore, sometimes taking as much as 2 hours, because of interruption of pain and frequency.
>
> There are times she is in my office, in pain, and I could see sold [sic] sweats running down her face cheek.  She has to stay in the bathroom for 30 minutes to 1 hour because of severe strangury (severe cramping pain).  She has frequency numbering 40-50 times daily.  Her urine always shows microhematuria with occasional gross hematuria, always with bacteria and occasionally will show a positive culture of bacillus.
>
> I am taking care of a lot of patients with interstitial cystitis, a few are disabled, most are controlled with hydrodilation with RIMSO instillation, Elmiron and few pain medications, antidepressants and anti-convulsants (Neurotonin), etc.
>
> Miss Elswicks is the worst case there is.  This patient used to be a young nurse with hope for the future and hope for a family but had to give up everything because of this disabling disease, which has no cure at the moment.
>
> As Dr. Firfer has indicated interstitial cystitis is unique in the different response to various treatment programs.  Also the severity of symptoms may not always reflect the objective tendencies in this disease.  Alicia fits all these and more.  I could not say it more strongly that Miss Elswick is totally disabled and

in no way could go back to any kind of employment in
the future.

(Id. at 6-7).

In a letter to Elswick dated March 29, 2006, LINA
advised that Dr. Sullesta's letter did not change its
determination that plaintiff was no longer disabled as of July
11, 2005.  (Id. at 3).  The letter noted that Dr. Sullesta "does
not provide any new medical information about your condition that
we did not previously have . . . [and] he does not address why he
previously informed us that you could perform medium work."  (Id.
at 4).

On June 19, 2006, plaintiff filed this lawsuit.


II.


"[A] denial of benefits challenged under §
1132(a)(1)(B) is to be reviewed under a de novo standard unless
the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan."  Firestone Tire & Rubber Co.
v. Bruch, 489 U.S. 101, 115 (1989).  If discretionary authority
exists for the administrator or fiduciary, then the proper

17

standard of review is whether the administrator or fiduciary
abused its discretion.  Id.

        In a footnote in their response, defendants assert that
they "do not waive any argument that a different standard of
review applies, but maintain that discovery is not warranted even
under a de novo standard." (Resp. at 4, n. 2).  However,
defendants make no argument based on the language of the plan
that the review should be only for an abuse of discretion.  The
remainder of defendants' response discusses the issue in terms of
a de novo standard.

        Plaintiff states, without evidentiary support, that
"LINA not only decides who gets benefits under the Plan, but it
is also responsible for paying those benefits from risk premiums
it has collected and invested.  To the extent that it can avoid
paying benefits, it may continue to retain those premiums."
(Reply at 4).  The following language of the plan supports the
first part of plaintiff's assertion, as it provides,

        The Insurance Company [LINA] will pay Disability
        Benefits if an Employee becomes Disabled while covered
        under this Policy. . . .  Satisfactory proof of
        Disability must be provided to the Insurance Company,
        at the Employee's expense, before benefits will be
        paid.

        The Insurance Company will require continued proof of
        the Employer's Disability, provided at the Employee's

18

expense, for benefits to continue.
(Id. at 769).  Plaintiff is likewise correct that the policyholder in this case, Camcare, paid monthly premiums to LINA under the terms of the plan.  (Id. at 776).

De novo review is presumed, and the plan administrator bears the burden of demonstrating that the abuse of discretion standard applies.  See Firestone, 489 U.S. at 115; Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 251-252 (2d Cir. 1999).  At least for the purposes of this motion, defendants have not met their burden, and the court applies the de novo standard.

III.

The principal case in this circuit for determining the propriety of extrinsic evidence in the midst of a de novo review is Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1025-27 (4th Cir. 1993).  Our court of appeals concluded that "courts conducting de novo review of ERISA benefits claims should review only the evidentiary record that was presented to the plan administrator or trustee except where the district court finds that additional evidence is necessary for resolution of the

19

benefit claim." <u>Id.</u> at 1026-27.

The court of appeals in <u>Quesinberry</u> lists six sets of "exceptional circumstances that may warrant an exercise of the court's discretion to allow additional evidence." <u>Id.</u> at 1027. The list of six is "not exhaustive but is merely a guide for district courts[.]" <u>Id.</u> Both of plaintiff's bases for supplementing the record pursuant to <u>Quesinberry</u> focus on the first of the six "exceptional circumstances," described as "claims that require consideration of complex medical questions or issues regarding the credibility of medical experts." <u>Id.</u>

Our court of appeals was careful "not [to] intimate, however, that the introduction of new evidence is required in such cases. A district court may well conclude that the case can be properly resolved on the administrative record without the need to put the parties to additional delay and expense." <u>Id.</u> To reiterate, only "when circumstances clearly establish that additional evidence is necessary to conduct an adequate <u>de novo</u> review of the benefit decision" is consideration of evidence outside the administrative record permissible. <u>Id.</u> at 1025. "[I]f the evidence is cumulative of what was presented to the plan administrator, or is simply better evidence than the claimant mustered for the claim review, the admission is not

necessary." Id. at 1027.

A.        Credibility of Dr. Sullesta

        Elswick contends that the first "exceptional
circumstance[]" that warrants supplementing the administrative
record is "consideration of . . . issues regarding the
credibility of medical expert[]" Dr. Sullesta.  (Mot. at ¶ 3).
Though the list in Quesinberry was not exhaustive, the court
finds it useful to analyze whether the request to supplement
falls within the language of the first exceptional circumstance.

        Dr. Sullesta's puzzling reversal between May 16 and
June 29, 2005 with respect to the plaintiff's potential for work
is undoubtedly a cause for concern.  Between July 14, 1999 and
May 16, 2005, Dr. Sullesta was steadfast in his opinion that
Elswick was disabled and unable to perform work of any kind.
(A.R. at 32, 140-141, 144-145, 169, 177, 216, 221-224, 226, 426,
429).  Yet, when Dr. Sullesta faxed back a form to LINA only six
weeks later on June 29, 2005, he circled and placed a checkmark
beside the third sentence which stated "I agree with Dr. Firfer
that she is capable of performing full-time Medium work."  (Id.
at 30).

21

In his two letters written after June 29, 2005, Dr. Sullesta returned to his previous position that plaintiff's condition prohibits her from any type of work.  (Id. at 6-7, 28-29).  In his most recent letter of March 14, 2006, for example, Dr. Sullesta concludes: "I could not say it more strongly that Miss Elswick is totally disabled and in no way could go back to any kind of employment in the future."  (Id. at 6-7).

Dr. Sullesta has acknowledged but has not adequately explained the inconsistency between his fax to LINA on June 29, 2005, and his telephone statement to Dr. Firfer six weeks earlier that Elswick could not work at all due to severe pain, much as he had been saying for the preceding six years.  His letter of March 14, 2006, states, "[i]t is true that I may have incidentally, in my conversation with Dr. Firfer, stated that Ms. Elswick could return to sedentary duty.  I was totally wrong."  (Id. at 6).

This statement raises further questions relating to Dr. Sullesta's credibility.  Dr. Sullesta admitted March 14, 2006, that he may have made a slightly different inconsistent statement in that he may have stated that Elswick could return to sedentary duty.  (Id.).  In his response of June 29, 2005, however, he circled the third sentence which indicated Elswick could return

22

to "full-time Medium work" rather than the sedentary work
option.[4]   (Id. at 30).

As noted above, Dr. Sullesta checked a box on September
19, 1997, that plaintiff could perform sedentary work, but not
any other type of work.  (Id. at 665).  On June 14, 1999, Dr.
Sullesta expressed that the effects of the medications jeopardize
plaintiff's ability to "hold[] any job position" and "Elswick
continues to be disabled."  (Id. at 426).  The discrepancy
between Dr. Sullesta's statements on September 19, 1997 and June
14, 1999, is not as important to resolution of the termination of
benefits issue as that which occurred in 2005 because neither of
the statements in 1997 or 1999 were relied upon by LINA in
terminating plaintiff's benefits.  Nevertheless, the conflict
underscores the imprecise nature of Dr. Sullesta's opinions of

---

[4]  The ability to perform sedentary work in 2005 would have
resulted in a loss of benefits for Elswick inasmuch as the plan
requires benefits to cease after 24 months if a claimant is able
to "perform all the material duties of any occupation for which
he or she may reasonably be qualified" and a transferrable skills
analysis conducted on July 6, 2005, by LINA revealed that there
were sedentary positions available for which plaintiff was
qualified.  (A.R. at 766, 72-73).  In 1997, however, Dr.
Sullesta's checkmark denoting that plaintiff could perform
sedentary work did not preclude her from collecting benefits
presumably because the plan allows for an employee to collect for
24 months if she is unable to perform her "regular occupation,"
which in this case was that of a nurse and thus is far from
sedentary.  (Id. at 766).

the plaintiff in the beginning and eight years later at the end
of her benefits period.

        Although <u>Quesinberry</u> does not address the meaning of
"credibility," it is understood in the common legal parlance to
mean "the quality that makes something (as a witness or some
evidence) worthy of belief." <u>Black's Law Dictionary</u> at 374
(Deluxe 7th ed. 1999).  Plaintiff seeks a further explanation of
the inconsistency of Dr. Sullesta's statements so that the court
may ascribe appropriate weight to each and ascertain an opinion
from Dr. Sullesta that may be worthy of belief.  This evidence
falls within the purview of the definition of credibility, and
the court finds Dr. Sullesta's thus far unexplained reversal of
his opinion to be an exceptional circumstance.

        The next step of the <u>Quesinberry</u> analysis requires an
inquiry into the necessity of such evidence.

        Dr. Sullesta's evaluation of plaintiff's disability has
always focused on the severity of her pain and the problems
associated with taking medication to reduce the pain.  (<u>Id.</u> at
32, 140-141, 144-145, 169, 177, 216, 221-224, 226, 426, 429).
Under the plan, long-term "disability" is defined as the
condition when an applicant is "unable to perform all the

**24**

material duties of any occupation for which . . . she may
reasonably become qualified . . . ."  (<u>Id.</u> at 766).  Severe pain
or debilitating effects of medication for pain could constitute
such a disability.  As her treating physician, Dr. Sullesta is in
the best position to evaluate the severity of her suffering and
the effects of the medication.  His analysis is even more
critical here as LINA relies upon medical professionals who have
not personally evaluated the plaintiff.  (<u>Id.</u> at 31-33, 61-65,
67).

     While acknowledging that plaintiff "may experience pain
attributed to Interstitial Cystitis[,]" LINA's stated rationale
in denying benefits was that there was "no current documentation
of bladder volumes and/or urinary frequencies to substantiate the
presence of a severe condition thereby preventing . . .
[plaintiff's] return to gainful employment."  (<u>Id.</u> at 64).

     Other than its own review of the file and Dr.
Sullesta's fax of June 29, 2005, the only other evidence LINA
relied on in deciding to terminate plaintiff's benefits appears
to be the peer review of Dr. Firfer, who did not unequivocally
dismiss plaintiff's severe pain as a basis for disability.  (<u>Id.</u>
at 31-33, 64).  Though Dr. Firfer never met or examined
plaintiff, the peer review nonetheless recognized "the records

sent to me are replete with frequent and heavy use of assorted analgesics for her subjective bladder pain," "[t]he severity of subjective pelvic pain may not reflect the objective changes of Interstitial Cystitis[,]" and Elswick's pain "has not been possible to resolve, permanently or completely" and was the "main problem" as described by Dr. Sullesta.  (Id. at 32-33).

Dr. Firfer's peer review declined to comment on the effects of the medication on the plaintiff's ability to work and deferred to an appropriate expert.  (Id.).  That expert, LINA's Associate Medical Director, summarily dismissed the issue as he "did not feel further clarification was needed since it had already been determined that the clinical evidence on file did not support a functional impairment that would preclude return to work."  (Id. at 64).  LINA's analysis in this respect does not provide the court with reason to conclude that plaintiff's pain and the effects of medication were fully considered in LINA's decision to deny benefits.

Dr. Firfer's peer review, the only basis for LINA's conclusion other than its own review of the file, is not so clear as LINA suggests in its denial letter.  In paragraph 1 of the determination section of the peer review, Dr. Firfer concludes that "[t]here is a minimal objective suggestion of interstitial

26

cystitis."  (Id. at 32).  In support, however, Dr. Firfer cites one bladder volume statistic under anesthesia of 600 cc from January 15, 2002, and then explains there were no volume statistics in the file after that date.  (Id.).  Previously, in his summary of records section of the peer review, Dr. Firfer noted a wide range of bladder capacity statistics of 900 cc and 500 cc in 1997 and 300 cc in 1998.  (Id. at 31).

While Dr. Firfer concluded that plaintiff's bladder volumes are not indicative of a debilitating case of interstitial cysitis, he admitted in paragraph 1 that notes from October 28, 2002, regarding frequency "could justify a diagnosis of interstitial cystitis."[5]  (Id. at 32).  Moreover, Dr. Sullesta's post-decision letters highlight plaintiff's frequency problem.  (Id. at 6-7, 28-29).

In summary, clarifying Dr. Sullesta's inconsistencies is especially important because he is the only medical professional to evaluate plaintiff personally and he had for years repeatedly concluded that the severity of plaintiff's pain

_____

[5] Though it is unclear whether all of the statistics were gathered when plaintiff was under anesthesia, Dr. Firfer states in paragraph 1 that there is "[n]o documentation as to her voiding frequency or bladder volume without anesthesia anywhere in the notes."  (Id. at 32).

and the effects of the medication for the pain were disabling.
Because the clinical evidence, or lack thereof, cited by LINA is
not enough, in and of itself, for the court to conclude that
benefits were properly denied, clarifying Dr. Sullesta's
statements, and ultimately his opinion, is critical to resolution
of the benefits decision.  Indeed, Dr. Sullesta's deposition
testimony is necessary in that LINA appears to have relied, in
significant part, on Dr. Sullesta's fax on June 29, 2005, in
deciding promptly thereafter to deny plaintiff's benefits.
(Id.).  Accordingly, the court finds that Dr. Sullesta's
explanation of his inconsistent statements is "necessary to
conduct an adequate de novo review of the benefits decision."
Quesinberry, 987 F.2d at 1025.

        Defendants respond that plaintiff had an opportunity to
explain the inconsistency of Dr. Sullesta during the internal
appeal process and failed to do so.  (Resp. at 6).  Essentially,
defendants argue that plaintiff waived her right to supplement
when she did not do so in the administrative appellate process.
(See id.).

        Our court of appeals described the decision in Davidson
v. Prudential Ins. Co. of America, 953 F.2d 1093, 1094-95 (8th
Cir. 1992), as a "helpful illustration[] of the appropriate

28

exercise of this discretionary scope of de novo review."
Quesinberry, 987 F.2d at 1026. The Eighth Circuit found it was
not an abuse of discretion for the district court to refuse to
consider additional, more favorable evidence created after
litigation had begun because the plaintiff knew or should have
known of such evidence during the administrative process.
Davidson, 953 F.2d at 1095. The court noted plaintiff was given
several opportunities to supplement the record during the
administrative process and described this request to supplement
as a "last-gasp attempt." Id.

After Quesinberry, the Tenth Circuit took the
principles articulated in Davidson one step further by
instructing district courts in dicta to only permit additional
evidence when it could not have been introduced during the
decisional period of the plan administrator.

> In considering any such motion, the district court will
> also need to "address why the evidence proffered was
> not submitted to the plan administrator," id., and
> should only admit the additional evidence if the party
> seeking to introduce it can demonstrate that it could
> not have been submitted to the plan administrator at
> the time the challenged decision was made. See, e.g.,
> Davidson v. Prudential Ins. Co. of Am., 953 F.2d 1093,
> 1095 (8th Cir. 1992) (holding that the district court
> did not err in refusing to admit extra-record evidence
> because the additional evidence "was known or should
> have been known to [plaintiff] during the
> administrative proceedings"). Conversely, "[i]f the
> administrative proceedings do not allow for or permit

29

the introduction of the evidence, then its admission
may be warranted."  Quesinberry, 987 F.2d at 1027.

Hall v. Unum Life Ins. Co. of America, 300 F.3d 1197, 1203 (10th
Cir. 2002).[6]


     Elswick replies that she had no means by which to
"compel Dr. Sullesta to respond to the administrator's inquiries"
during the internal appeal process.  (Reply at 3).  She had no
subpoena power.  Dr. Sullesta wrote the letter dated December 9,
2005, on plaintiff's behalf for her appeal, which demonstrates
Elswick's good faith attempt to have Dr. Sullesta explain the
discrepancy.  (A.R. at 28-29).  But Dr. Sullesta did not give any
explanation for his 180-degree turn from his long-held view of
May 16, 2005 (plaintiff cannot work due to severe pain) to June
29, 2005 (checking the block that plaintiff can perform full time
medium work).  Later, Dr. Sullesta muddied the waters even
further by stating in his post-appeal letter of March 14, 2006,
that "I may have incidentally in my conversation with Dr. Firfer,
stated that Ms. Elswick could return to sedentary duty."  (Id. at
6).  Because Elswick was in no position to compel Dr. Sullesta to
produce the evidence that could rehabilitate Dr. Sullesta's

_____

     [6]  Neither of these cases address why the evidence was not
presented during the administrative process.  Hall, 300 F.3d at
1204; Davidson, 953 F.2d at 1095.

                              30

credibility in the internal appeal process, the court finds, in accordance with the principles articulated in <u>Hall</u>, she is not precluded from supplementing the record with such evidence now.

The court will permit plaintiff to supplement the record with deposition testimony of Dr. Sullesta for the purpose of fully explaining his rank inconsistencies such that his opinion with respect to plaintiff's disability and potential for work is clear.

B.      Interstitial Cystitis

Alternatively, plaintiff argues interstitial cystitis qualifies as a "complex medical question" within the first "exceptional circumstance" described in <u>Quesinberry</u>.  (Mot. ¶ 4). Plaintiff contends that only "scant information" on interstitial cystitis exists in the administrative record, and "[t]he disease is poorly understood as a general matter and only beginning to attract significant interest within the medical community." (<u>Id.</u>).  Because of this alleged deficiency in the record, plaintiff seeks "to produce learned treatises, research papers, and reliable medical literature to give the Court (and LINA) a general idea of the disease, its debilitating effects, and the

prospects for treatment."  (Id.).

        Based on the existing administrative record, the court
has determined, as earlier stated, that interstitial cystitis is
an incurable urinary bladder disease of unknown cause
characterized by urinary frequency, urgency, and pain in the
bladder.  (Id. at 6-7, 28-29, 683).  The court thus has a
rudimentary understanding of the disease.  "[L]earned treatises,
research papers, and medical literature giv[ing] the Court . . .
a general idea of the disease" would be cumulative and prohibited
by Quesinberry.  987 F.2d at 1027.  Without more specifics from
the plaintiff, it does not appear that a fuller understanding of
interstitial cystitis is required to resolve the benefits
decision.

        Another area plaintiff seeks to supplement is the
"debilitating effects" of the disease.  Both Dr. Sullesta and Dr.
Firfer agree that individual cases of interstitial cystitis may
vary substantially as far as the extent of the debilitating
nature of symptoms.  (A.R. at 6, 33).  For resolution of the
issues presented here, the most important consideration will be
the plaintiff's specific form of interstitial cystitis.  The
debilitating effects of Elswick's condition are found throughout
the record.  (Id. at 6-7, 28-29, 51-52, 61-65, 91-92, 120-124,

127-137, 144-150, 176-186, 204-213, 215-216, 223-236, 241-242,
257-270, 313-316, 329-347, 351-357, 362-369, 371-372, 377-384,
388-395, 399-406, 409-416, 426, 429-434, 441-447, 450-454, 484-
486, 520-521, 561-567, 571-575, 580-587, 622-624, 629-630, 651-
653, 663-668, 678, 708, 716-719, 725-729, 781-782).  Any
supplement of these issues would likewise be cumulative and
prohibited under the reasoning of Quesinberry.  987 F.2d at 1027.

        As to the "prospects for treatment," Dr. Firfer's peer
review notes that "[t]he patient has refused Botox and InterStim
therapies which have been reported to help in some resistant
circumstances."  (A.R. at 33).  Although LINA notes this
statement in its letter of July 20, 2005, explaining its decision
to deny benefits, LINA neither offered nor relied on the
plaintiff's failure to agree to treatments as a reason for its
decision to terminate benefits.  (Id. at 62, 64).  Their
reasoning was focused entirely on the lack of clinical evidence
and the quoted opinions of Drs. Sullesta and Firfer that she
could return to work.  (Id. at 64).  Consequently, evidence of
the prospects of Botox and InterStim treatment would not aid the
court in evaluating the ultimate benefits determination.

        In sum, additional evidence on interstitial cystitis
would be cumulative or unnecessary for adequate review of the

benefits decision.


                              IV.


          At the conclusion of plaintiff's motion, Elswick
"presumes that, inasmuch as evidence of . . . economic losses and
consequential damages resulting from the termination of . . .
benefits could not have been, by definition, presented prior
thereto, . . . [plaintiff] will be permitted to submit such
evidence in the instant proceeding to the extent permitted by
law."   (Mot. ¶ 5).

          However, extra-contractual damages are unavailable in
an ERISA case.   See Massachusetts Mutual Life Ins. Co. v.
Russell, 473 U.S. 134, 144 (1985); Reinking v. Philadelphia Am.
Life Ins. Co., 910 F.2d 1210, 1220 (4th Cir. 1990) (overruled on
other grounds by Quesinberry, 987 F.2d 1017 (4th Cir. 1993));
Glencoe v. Teachers Ins. and Annuity Ass'n of America, 69 F.
Supp.2d 849, 852-853 (S.D. W.Va. 1999); Farrie v. Charles Town
Races, Inc., 901 F. Supp. 1101, 1105-1106 (N.D. W.Va. 1995).   The
court finds that the plaintiff may not present evidence or seek
to supplement the record for consequential or other extra-
contractual damages.

                              34

V.


Accordingly, it is ORDERED that the motion of the
plaintiff to develop evidence in supplement of the administrative
record be, and it hereby is, granted to the extent the plaintiff
is permitted to supplement the record with deposition testimony
of Dr. Sullesta for the purpose of fully explaining his
inconsistencies such that his opinion with respect to plaintiff's
disability and potential for work is clear.  It is further
ORDERED that the motion is denied insofar as it seeks to
supplement the record with information on interstitial cystitis
generally and plaintiff's consequential or extra-contractual
damages resulting from the termination of benefits.

It is further hereby ORDERED that the parties adhere to
the following schedule:

1.  The deposition of Dr. Renee Sullesta shall occur
    by October 31, 2007.

2.  The motions for summary judgment and corresponding
    memoranda in support shall be due by November 30,
    2007 with responses due by December 14, 2007, and

35

replies due by December 21, 2007; and

3.    A settlement meeting between the parties shall

occur by December 21, 2007.

The Clerk is directed to forward copies of this

memorandum opinion and order to all counsel of record.

DATED: September 20, 2007

John T. Copenhaver, Jr.
United States District Judge

36